J-S33001-22, J-S33002-22 & J-S33003-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.S.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1687 EDA 2022 |

Appeal from the Decree Entered June 16, 2022,
in the Court of Common Pleas of Philadelphia County,
Juvenile Division at No(s):  CP-51-AP-0000352-2022.

| | | |
|---|---|---|
| IN THE INTEREST OF: W.R.A.,JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1689 EDA 2022 |

Appeal from the Decree Entered June 16, 2022,
in the Court of Common Pleas of Philadelphia County,
Juvenile Division at No(s):  CP-51-AP-0000353-2022.

| | | |
|---|---|---|
| IN THE INTEREST OF: A.T.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.J., MOTHER | : | |
| | : | |
| | : | |
| | : | No. 1691 EDA 2022 |

J-S33001-22, J-S33002-22 & J-S33003-22

Appeal from the Decree Entered June 16, 2022,
in the Court of Common Pleas of Philadelphia County,
Juvenile Division at No(s): CP-51-AP-0000354-2022.

BEFORE: KUNSELMAN, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED NOVEMBER 30, 2022**

C.J. (Mother) appeals the decrees issued by the Philadelphia County Court of Common Pleas, which terminated her rights to sons, 12[1]-year-old C.S.J. and 9-year-old W.R.A., Jr., and to her daughter, 8-year-old A.T.A. (collectively, the Children), pursuant to the Adoption Act. *See* 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b).[2]  Because Mother raised the same issues as to each Child, we address Mother's appeals in one memorandum.  After careful review, we affirm.

The family had been involved with the Philadelphia Department of Human Services (DHS) for a decade.  C.S.J. was originally adjudicated dependent in April 2012, when he was less than two years old.  W.R.A. was born premature in January 2013; he was adjudicated dependent a month later.  In both cases, the cause for removal was Mother's alleged drug use and DHS's concerns about Mother's mental health.

However, Mother had substantially satisfied her reunification goals, and the dependency court reunified the Children with Mother in July 2013.

_____

[1] C.S.J. was nearly 13 years old.

[2] At the time of the termination hearing, the trial court granted the parties' request to bifurcate the fathers' respective cases due to imperfect service.

- 2 -

Meanwhile, A.T.A. was born in January 2014. DHS continued to supervise the family until 2016, when the cases of the younger Children were discharged; services remained in place for C.S.J., because he displayed behavioral issues in school.

But just as the permanency cases were winding down, DHS obtained an order for protective custody in December 2016. DHS was concerned Mother had neglected the Children, as evinced by the Children's poor hygiene, the lack of a working refrigerator or food in the home, and Mother's refusal to allow DHS to fully assess the residence. The dependency court again removed the Children from the home.

In January 2017, the Community Umbrella Agency (CUA) developed a single case plan to aid Mother with reunification. Mother's objectives included: to participate in the Children's education, well-being, and behavioral health needs; to make reasonable efforts to attend to the Children's appointments; to comply with the treatment plans and recommendations; to participate in parenting classes and allow CUA in the home. The goal of family therapy was later added to Mother's single case plan.

Over the next five years, Mother's level of compliance generally dropped from "full" to "substantial" to "moderate" to "minimal." By late 2021, the dependency court determined that Mother was not compliant with C.S.J.'s and W.R.A.'s permanency plans, and only minimally compliant with A.T.A.'s plan. DHS filed petitions to terminate Mother's rights on June 2, 2022. The orphans' court conducted an evidentiary hearing on June 16, 2022, and subsequently

terminated Mother's rights as to all three Children. Mother timely filed this appeal, wherein she presents four issues:

1. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, pursuant to 23 Pa.C.S.A. § 2511(a)(1) where Mother presented evidence that she made significant efforts to perform her parental duties?

2. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, pursuant to 23 Pa.C.S.A. § 2511(a)(2) where Mother presented evidence that she made significant efforts to remedy any incapacity or neglect?

3. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, pursuant to 23 Pa.C.S.A. § 2511(a)(5) and (a)(8)?

4. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, pursuant to 23 Pa.C.S.A. § 2511(b) where evidence was presented that Mother has a positive parental bond with the Children that would be detrimental to sever?

Mother's Brief at 8.

We begin with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that

often have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial. ***In re Adoption of L.A.K.***, 265 A.3d 580, 597 (Pa. 2021); ***see also Interest of S.K.L.R.***, 265 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving…the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate could should not search the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." ***In re P.Z.***, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section

> 2511(b): determination of the needs and welfare of the child[.]

*In re C.M.K.*, 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)). We add that we may uphold a termination decision if any proper basis exists for the result reached. *C.S.*, 761 A.2d at 1201. Importantly, we need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Because we may affirm under any one subsection, we review the orphans' court determinations under Section 2511(a)(2), which corresponds with Mother's second appellate issue. The relevant section provides:

> (a) **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> […]
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." **C.M.K.**, 203 A.3d at 262 (citation omitted).

We turn now to Mother's appellate challenge to the orphans' court determination that DHS established grounds under Section 2511(a)(2). Mother presents a singular argument as to all three Children. She starts by explaining that "past incapacity alone is not sufficient basis for involuntary termination." **See** Mother's Brief at 19-20 (citing **In re Adoption of A.N.D.**, 520 A.2d 31, 35 (Pa. Super. 1986)). Mother reasons that she was actively completing her reunification objectives, including her parenting goals, anger management, submission to random drug screens, housing, and employment. **Id.** at 20. For support, Mother cites her cross-examination of the CUA case manager, who conceded that Mother participated in, or completed, various programs. **See** N.T., 6/16/22, at 65-68. Because she had substantially achieved her goals, thereby demonstrating her capacity to parent the Children, Mother concludes that termination under Section 2511(a)(2) was erroneous.

This argument fails for two reasons. First, the litany of achieved objectives Mother claims she achieved to all occurred several years earlier.

Although Mother has maintained employment and housing, Mother has not complied with her single case plans for some time. Notably, she failed to report to the Clinical Evaluation Unit for drug tests, and she failed to provide documentation of substance abuse and mental health treatment. She also did not permit the Agency to investigate the suitability of her home.

Second, and more importantly, Mother's argument does not address the primary basis for the court's Section 2511(a)(2) decision – namely Mother's "repeated and continued…***refusal***…caused the child[ren] to be without essential parental care." ***See*** 23 Pa.C.S.A. § 2511(a)(2) (emphasis added).

The orphans' court found that Mother believed she had done enough to reunify with the Children, and that she flatly refused to do any more. ***See*** N.T at 78-79. The court's finding is supported by the record. The CUA case manager testified:

> Mother said she went to the Arc [(reunification center)]. She completed parenting. And she completed a lot of her single case plans and she was not going back to do anything over again and that the City can blank, blank, blank her you-know-what and that was not going to cooperate with anything. She just wanted her kids back because the City took her kids wrongfully and that she was going to file a lawsuit against the City.

***Id.*** at 46.

Mother admitted as much: "[…] I did tell [the case manager] that I wasn't going to do anything else because I have already done it and – until I see my Children because I haven't seen my Children in over year." ***Id.*** at 52.

Thus, it was Mother's **refusal** to parent which left the Children without essential parental care, control or subsistence, and it was her **refusal** to parent that the court determined Mother could not, or would not, remedy. **See** 23 Pa.C.S.A. § 2511(a)(2). Mother presents no argument to contest this finding.

We conclude that the orphans' court did not abuse its discretion when it determined DHS met its burden under Section 2511(a)(2). Thus, we conclude the first portion of the bifurcated termination analysis was proper. Given this disposition, we need not address the court's decisions as to the other Section 2511(a)(1), (5), and (8), nor Mother's arguments regarding the same. Instead, we proceed directly to Mother's final appellate issue, which concerns the second portion of the bifurcated termination analysis under Section 2511(b):

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(b).

This Court has explained that:

> [S]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.,* 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Concerning the bond, the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship. *See C.M.K.*, 203 A.2d at 264 (citation omitted); *see also K.Z.S.*, 946 A.2d at 764 (holding there was no bond worth preserving where the child had been in foster care for most of the child's life, which caused the resulting bond to be too attenuated). Moreover, the court is not required to use expert testimony to resolve the bond analysis. *In re Z.P.*, 994 A.2d 1108, 1121 (citing *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008)).

"Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268. Finally, we emphasize that "[w]hile a parent's emotional bond with her and/or her child is a major aspect of the Section 2511(b) best-interest analysis, it is

- 10 -

nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." **In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted).

On appeal, Mother again advances a single argument as to all three Children. She starts by alleging she had regular visitation with the Children until 2021. At that point, visitation ceased, and she had not seen the older Children (C.S.J. and W.R.A.) in over a year.[3] Mother argues "[i]t is impossible to assess the bond between Mother and her Children and whether termination of Mother's parental rights would have a detrimental effect on the Children based on the fact that Mother did not even have the opportunity to visit with the [(older)] Children for approximately 12-15 months preceding the termination of parental rights hearing." **See** Mother's Brief at 23. Mother concludes that DHS did not establish grounds for termination under Section 2511(b).

Mother's argument is without merit. We reiterate that "where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." **J.M.**, 991 A.2d at 324 (citing **K.Z.S.**, 946 A.2d at 762-63)). Mother's appeal may end here.

But for the sake of completeness, we review the orphans' court's determinations under this section. The orphans' court found:

> The testimony reflects that there is no bond nor relationship,
> that these Children would not suffer irreparable harm if the

---

[3] Mother continued to have visitation with A.T.A. until 2022.

- 11 -

> parental rights were terminated. The Children look to the foster parents to meet their needs. Testimony reflects that they're doing well with their foster parents, who are meeting their developmental, physical and emotional needs and welfare of the Children. Unfortunately, they have spent most of their lives in foster care.

N.T. at 79.

After review, the record supports the determinations rendered by the orphans' court. The CUA case manager opined that the Children would not experience irreparable harm if Mother's rights were terminated. *Id.* at 23. The case manager opined there was no bond, nor even a relationship, between the Children and Mother. *Id.* The case manager explained there was no relationship because the Children had been without parental care for years.

We observe that the older Children – 12-year-old C.S.J. and 9-year-old W.R.A. – elected not to visit Mother since 2021. The visits between Mother and 8-year-old A.T.A. continued through May 2022, but we note A.T.A. wanted to stop visitations "a while back." The CUA encouraged the Child to keep visiting Mother until May 2022, after an incident between A.T.A. and Mother. During a May 2022 visitation, Mother "snatched [a khimar] off her head and was very mean to her and yelled in her face and told her that she would not be a Muslim." *Id.* at 21.[4]

---

[4] A khimar is a head-covering that is worn by some Muslim women. We clarify the relevance of this incident. Whether Mother retained the right to make religious decisions on behalf of her Child is of no moment. The more pertinent fact is that Mother unceremoniously grabbed the khimar off the Child's head, which upset the Child so much that the Child did not want to see Mother
*(Footnote Continued Next Page)*

Mother blamed the case manager for the lack of relationship between Mother and the Children. During her cross-examination of the case manager, Mother was able to elicit testimony that even though a family therapy goal was added to Mother's single case plan, the case manager never made a referral. *See id.* at 38-39. Thus, in Mother's view, she could not be held responsible for the Children's refusal to see her.

Although we have some concern with CUA's lack of follow-through regarding the family therapy referral, we are cognizant that the remedy for an agency's failure to provide reunification services is not to delay permanency by denying termination. *See In re D.C.D.*, 105 A.3d 662, 675 (Pa. 2014). We also observe the orphans' court noted that the Children already received therapy on an individual basis. And that the Children's therapists never reached out to the Agency so that Mother could be included. *See* N.T., 78; 46-47. Evidently, this was a mitigating factor for the orphans' court. In other words, the Children received treatment to process the trauma they endured; it was not the case that DHS sat back as the Children's emotional wellbeing deteriorated to the point where DHS felt confident it could obtain termination decrees. In fact, the record reveals the Agency's efforts to coax A.T.A. into visiting Mother in an attempt to preserve their relationship.

_____

thereafter. It's the emotional impact of Mother's actions that we observe, regardless of whether the parent had a *bona fide* right to decide if her child wore a khimar, or a cross, or a yarmulke, or a bindi. It is telling that this incident was the final straw for A.T.A.

Ultimately, whether the Children wanted to see Mother is not dispositive. Mother's refusal to cooperate with the Agency's reunification efforts meant that Mother never obtained anything beyond supervised visits. Meanwhile, the Children's respective dependency cases lingered. Over time, Children did not desire a relationship with Mother and began to look to their respective foster parents for support, security, and permanency.[5] The Children's lack of bond with Mother is a symptom of Mother's refusal to parent, not a failure on the part of DHS. Mother's argument merits no relief.

In sum, we discern no error, nor abuse of discretion, concerning the orphans' court decisions as to Section 2511(a)(2) and (b). We conclude that the court properly applied the bifurcated termination analysis in each Child's respective case.[6]

_____

[5] C.S.J. and A.T.A. were placed in the same foster home. W.R.A. was placed in a separate foster home. Both homes are now pre-adoptive resources.

[6] As a final matter, we address the prolonged nature of this matter. These Children were removed from the home, for the second time, in 2016. The termination decrees were not entered until June 2022, five and a half years later. In the ten years since C.S.J. was removed, this case saw multiple judges and multiple case managers. Even Children's guardian *ad litem* was initially confused as to his representation at the start of the termination hearing. **See** N.T. at 5.

We remind the orphans' court and DHS to guard against foster care drift. As our Supreme Court explained:

> [C]ourts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development

*(Footnote Continued Next Page)*

Decrees affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/30/2022

---

> quickly. When courts fail…the result, all too often, is
> catastrophically maladjusted children.

***T.S.M.***, 71 A.3d at 269.

Although the Juvenile Act "does not establish a litmus test that requires a juvenile court to alter the course of reunification due simply to the amount of time a child has been in placement[; i]t does, however, create a mechanism for keeping juvenile courts alert to the potential for foster care drift, *i.e.*, where the children languish in the foster care system while their parents unsuccessfully attempt to regain custody." ***P.Z.***, 113 A.3d at 846-47 (further citations and quotations omitted). ***Id.*** at 847.

"Specifically, if a child has been in custody for 15 of the last 22 months, the court must inquire as to whether a termination petition has been filed, absent the listed exceptions [in 42 Pa.C.S.A. § 6351(f)(9)(i-iii).] […] Requiring a court to inquire whether an agency has filed for termination promotes timely permanency for children rather than subject them to foster care drift." ***In re D.C.D.***, 105 A.3d 662, 674-75 (Pa. 2014).

Here, given the scarcely detailed permanency review orders, it is unclear whether the dependency court made the requisite inquiries under Section 6351(f)(9) – though, we note the record does contain termination petitions from 2018. The trial court opinion, which technically complied with Pa.R.A.P. 1925(a), provides no other background information. Based on the orders, it is unclear whether the delay in this case was warranted. In light of this, we simply remind the court to provide details in its permanency review orders when the child has been in custody for 15 of the last 22 months to ensure that case is progressing to permanency in a timely fashion.